UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DALE ALLEN HURICK,

       Petitioner,

v.                                       Case No. 2:14-cv-81
                                       HON. ROBERT HOLMES BELL

JEFFREY WOODS,

       Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner Dale Allen Hurick filed this petition for writ of habeas corpus, challenging his jury conviction for first degree murder. Petitioner was sentenced to life imprisonment. The respondent has filed an answer and has complied with Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. The parties have briefed the issues and the matter is now ready for decision.

Petitioner alleges that:

I. Petitioner was denied adjournment to conduct an independent forensic evaluation.

II. Denied adjournment to conduct an evidentiary hearing.

III. Insufficient evidence to convict of first degree murder.

IV. Petitioner was denied his Constitutional right to a fair trial by a non-biased and impartial trial court where the trial court made numerous decisions and comments which were adverse to Petitioner's ability to properly defend himself, thereby rendering the result of the trial unreliable.

V. Petitioner was denied his Sixth Amendment right to confront his accuser where Richard Bowles refused to testify at trial, thereby depriving trial counsel the ability to cross-examine him prior to the

Court allowing Bowles' preliminary examination testimony to be read at trial.

VI.  Petitioner was denied his Fourth Amendment right where there was no probable cause determination made prior to the issuance of the invalid complaint and subsequent arrest warrant, mandating a suppression of the evidence obtained therein.

VII.  Petitioner's statements must be suppressed where (1) they were made in direct violation of his Fifth Amendment rights; (2) the statements were made under threat, duress, and coercion, and (3) they were made by the Petitioner who was not competent to waive his Miranda rights.

VIII.  Petitioner was denied his Sixth Amendment right to effective assistance of counsel, for no strategic reason, made numerous outcome determinative errors and failed to put the Prosecution's case to any meaningful adversarial testing.

IX.  Petitioner was denied his Sixth and Fourteenth Amendment rights to effective assistance of appellate counsel where appellate counsel failed to raise any of the obvious and significant issues presented herein, and was therefore deprived of his right to fundamental fairness.

Petitioner also filed a motion for summary judgment, arguing that there exists no genuine issue of fact on his claims that there was no probable cause determination made prior to the issuance of his criminal complaint and arrest, that his statements to police were made in violation of his Fifth Amendment rights and were the product of coercion, that the trial court erred by not granting Petitioner an adjournment for an evidentiary hearing to determine whether Petitioner's statements to police were voluntary or coerced, and that the trial court violated Petitioner's rights by not adjourning trial to allow Petitioner to have independent examinations regarding his competency to stand trial and competency to waive his *Miranda* rights.  Petitioner requests the same relief in his summary judgment motion that he requests in his petition for writ of habeas corpus.  The

summary judgment motion and the petition will be considered together since the arguments and relief requested are the same.

In April of 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) became effective.  Because this petition was filed after the effective date of the AEDPA, this Court must follow the standard of review established in that statute.  Pursuant to the AEDPA, an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This provision marks a "significant change" and prevents the district court from looking to lower federal court decisions in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  To justify a grant of habeas corpus relief under this provision of the AEDPA, a federal court must find a violation of law "clearly established" by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  The Supreme Court held that a decision of the state court is "contrary to" such clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts."  *Id.*  A state court decision will be deemed an "unreasonable application" of clearly established federal law "if the state court identifies

- 3 -

the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 412. Rather, the application must also be "unreasonable." *Id.* Further, the habeas court should not transform the inquiry into a subjective one by inquiring whether all reasonable jurists would agree that the application by the state court was unreasonable. *Id.* at 410 (disavowing *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). The habeas corpus statute has long provided that the factual findings of the state courts, made after a hearing, are entitled to a presumption of correctness. This presumption has always been accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). Under the AEDPA, a determination of a factual issue made by a state court is presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denied*, 527 U.S. 1040 (1999).

Petitioner argues that the trial court erred in failing to grant an adjournment for an independent forensic evaluation. The Michigan Court of Appeals rejected this claim under a plain error standard explaining:

- 4 -

Defendant initially disputes the propriety of the trial court's denial of a requested adjournment "for the purpose of having independent forensic evaluations conducted on the issues of criminal responsibility, competency to stand trial and competency to waive *Miranda*." In October 2009, shortly before trial, defendant urged the trial court to grant an adjournment for an independent examination of his competency to waive his *Miranda* rights at the time he made inculpatory statements to the police. We generally review for an abuse of discretion a trial court's ruling whether to grant an adjournment. *People v Coy*, 258 Mich App 1, 18; 669 NW2d 831 (2003). However, defendant did not ask for an adjournment to facilitate either an independent evaluation of his competency to stand trial or an independent criminal responsibility examination. Consequently, we limit our consideration of these purported improprieties to whether any plain error affected defendant's substantial rights. *People v Cross*, 281 Mich App 737, 738; 760 NW2d 314 (2008). . . .

In January 2009, shortly after defendant's circuit court arraignment, his counsel requested that the court order evaluations pertaining to defendant's competency to stand trial, competency to have waived his *Miranda* rights, and criminal responsibility. By the end of January 2009, the court had ordered all three evaluations at the center for forensic psychiatry. Although of the three evaluations, only the criminal responsibility examination appears in the trial court record or appended to the parties' briefs on appeal, the parties apparently do not dispute that the center for forensic psychiatry evaluations deemed defendant competent to stand trial, competent to waive his *Miranda* rights, and not suffering any mental defect or deficiency potentially relieving him of criminal responsibility for killing the victim. On June 28, 2009, defendant first moved to adjourn the July 6, 2009 scheduled trial date to accommodate the not-yet-conducted center for forensic psychiatry's competency to waive *Miranda* evaluation. On July 6, 2009, the trial court denied the motion, but the chief circuit court judge overruled the trial court and adjourned the trial date until October 26, 2009. Through a substitute, retained counsel, defendant next orally sought an adjournment of trial on October 16, 2009, solely to allow "for an independent evaluation on the competency to waive [*Miranda*]." The trial court agreed that it would refer defendant for an independent *Miranda* competency evaluation. However, the trial court refused to adjourn trial again to facilitate the independent evaluation. The trial court reiterated its refusal to adjourn trial when defense counsel made identical oral requests on October 21, 2009 and October 26, 2009.

Our review of the record reveals a glaring deficiency in the area of good cause warranting any adjournment of defendant's trial for the purpose of securing independent psychiatric evaluations. MCR 2.503(B)(1); *Jackson*, 467 Mich at 276; *Coy*, 258 Mich App at 18. On January 28, 2009, in response to the trial court's inquiry why defense counsel wanted an examination to delve into defendant's competency to waive his *Miranda* rights, counsel mentioned in nonspecific fashion, "Because he has a closed head injury as well as there is some schizophrenia. And I'm getting this from the family. And I've had conversations with [defendant] . . . and it's a little difficult to communicate with him." But the record otherwise remains entirely devoid of any medical records, testimony, affidavits or any offer of proof tending to substantiate that defendant suffered from a mental illness or infirmity that may have diminished or precluded his culpability for killing the victim. Notably, defendant also never notified the trial court that he intended to raise an insanity defense, in conformity with MCL 768.20a.

In light of defendant's failure to present any evidence suggesting that he labored under a mental defect or disease that could affect his culpability or capacity to stand trial or waive *Miranda*, he has not demonstrated any good cause to justify independent psychiatric evaluations of his competency to stand trial, competency to waive his *Miranda* rights, or criminal responsibility. Accordingly, defendant has not shown that the trial court abused its discretion in denying his unsupported motions to adjourn the proceedings to obtain an independent *Miranda* waiver evaluation, and defendant has not shown any plain error relating to his unpreserved claim concerning an independent criminal responsibility examination.

*People v. Hurick*, Mich. Court of Appeals decision, ECF No. 12-18, PageID. 845-846. (notes omitted).

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent

and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

After expressly noting Petitioner's default in failing to preserve this issue, the Michigan Court of Appeals then reviewed Petitioner's claim for plain error, finding none.  In this circuit, "plain error review does not constitute a waiver of state procedural default rules."  *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *see also  Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th

Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice").

In the opinion of the undersigned, Petitioner has not shown cause or prejudice for his procedural default of this issue. Petitioner has not set forth facts showing that his counsel erred in failing to obtain an independent psychiatric examination to establish competence. Nor has Petitioner shown a need for an independent psychiatric examination or that such an examination would have changed the result in this case. Petitioner has failed to show that the Michigan Court of Appeals' decision resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Similarly, Petitioner argues that he was denied an adjournment so that the court could conduct a hearing to question the voluntariness of his confession. In rejecting this claim the Michigan Court of Appeals stated:

> In defendant's next appellate contention, he insists that the trial court's denial of a "motion to adjourn . . . trial in order to conduct an evidentiary hearing to test whether his inculpatory statement to police was voluntary, knowing and intelligent constitute[d] an abuse of discretion and reversible error." Contrary to defendant's appellate characterization of the record, his trial counsel never specifically asked the trial court to hold a *Walker* hearing to investigate whether his statements to the police in December 2008 qualified as voluntary, knowing and intelligent. Therefore, we review this unpreserved issue only to determine whether any plain error affected defendant's substantial rights. *Cross*, 281 Mich App at 738.
>
> The defense at no point raised a challenge to the admissibility of the statements defendant made to the police. Although a trial court must sua sponte investigate the voluntary nature of a defendant's statement

> if "the evidence clearly and substantially reflects a question about the voluntary nature of a confession or implicates other due process concerns," the record reveals no such circumstances in this case. *People v Ray*, 431 Mich 260, 271; 430 NW2d 626 (1988). The parties do not dispute that the only forensic psychiatric evaluation in the record concluded that defendant had the capacity to waive his *Miranda* rights at the time he made his statements, and defendant presented no evidence tending to substantiate that he labored under any mental or emotional infirmity that might have placed in doubt the voluntary, knowing and intelligent nature of his statement. Furthermore, the available record gives rise to no suggestion of police coercion. The police arrested defendant on December 15, 2008, and a deceased police officer attempted to interview defendant on December 16, 2008. The sergeant who testified at trial recounted that he briefly and unsuccessfully interviewed defendant at some point on December 17, 2008, and that he later returned to discuss the victim's murder with defendant at defendant's request. The December 17, 2008 interviews encompassed approximately 90 minutes, and the sergeant denied noticing any signs that defendant had offered his statements unwillingly.

*People v. Hurick*, Mich. Court of Appeals decision, ECF No. 12-18, PageID. 847. (notes omitted).

The Michigan Court of Appeals reviewed this issue under a plain error standard because Petitioner never moved for a hearing to determine the voluntariness of Petitioner's statements. Petitioner has failed to show either cause or prejudice for this failure. As explained in the Michigan Court of Appeals decision, the record does not support the position that Petitioner's statements were involuntary. Petitioner has presented no evidence that supports a contrary position. In the opinion of the undersigned, the Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner claims that there existed insufficient evidence to convict him of first degree

murder.  The Michigan Court of Appeals stated:

> Defendant lastly challenges the sufficiency of the evidence supporting his first-degree murder conviction, contending that only "purely circumstantial" evidence and his improperly admitted "inculpatory statement to a police interrogator" tended to prove his guilt. In defendant's estimation, "there was no credible or reliable evidence presented upon which to find him guilty beyond a reasonable doubt." When reviewing a criminal defendant's challenge to the sufficiency of the evidence, this Court considers all the evidence presented in the light most favorable to the prosecution to determine whether a reasonable juror could find the defendant's guilt proven beyond a reasonable doubt. *People v Nowack*, 462 Mich 392, 399-400; 614 NW2d 78 (2000).  This Court must draw all reasonable inferences and make credibility choices in support of the jury's verdict; the Court should not interfere with the factfinder's role in determining witness credibility or the weight of the evidence. *Nowack*, 462 Mich at 400; *People v Elkhoja*, 251 Mich App 417, 442; 651 NW2d 408 (2002), vacated in part on other grounds 467 Mich 916 (2003).
>
> To convict a defendant of first-degree premeditated murder, the prosecution must prove that the defendant intentionally killed the victim, and that the act of killing was premeditated and deliberate. *People v Ortiz*, 249 Mich App 297, 301; 642 NW2d 417 (2002). Premeditation and deliberation require sufficient time to permit the defendant to take a second look. *People v Abraham*, 234 Mich App 640, 656; 599 NW2d 736 (1999); *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995). Premeditation and deliberation may be established by evidence of (1) the prior relationship between the defendant and the victim, (2) the defendant's actions before the murder, (3) the circumstances of the killing itself, including the type of weapon used and the location of the wounds inflicted, and (4) the defendant's conduct after the murder.  *Abraham*, 234 Mich App at 656; *People v Berry (On Remand)*, 198 Mich App 123, 128; 497 NW2d 202 (1993). Circumstantial evidence and the reasonable inferences arising therefrom may suffice to prove the elements of a crime, and "[m]inimal circumstantial evidence is sufficient to prove an actor's state of mind." *Ortiz*, 249 Mich App at 301; *Abraham*, 234 Mich App at 656. "Proof of motive is not essential." *Abraham*, 234 Mich App at 657.
>
> The victim and defendant shared a lengthy acquaintanceship or friendship; they spent most of the evening of December 11, 2008

drinking alcohol with other friends in a couple south Detroit bars. After midnight on December 12, 2008, defendant and the victim visited 1962 Cabot Street in Detroit, defendant's temporary residence, where they drank some more alcohol.  Another occupant of 1962 Cabot, Francisco Saadedra, testified that just before defendant and the victim walked out into the night together, he noticed "something on [defendant] that looked like the handle or a grip of some kind of tool like a hammer or screwdriver or something." Saadedra denied having noticed defendant in possession of the tool either when defendant and the victim first arrived at 1962 Cabot, or when defendant returned to 1962 Cabot alone, "10 or 15 minutes" after defendant and the victim had departed. Saadedra recalled that when defendant walked back inside 1962 Cabot, "[h]e came in and he went upstairs rapidly and when he came back down his hands and face had been washed," which Saadedra gleaned from the fact that when defendant came downstairs a few minutes later he was shirtless and had "water dripping off him."  Saadedra nonetheless saw something red on defendant's hands, and that defendant "sat down in the dining room area to clean his shoes. They were black with a white streak on them and [Saadedra] could see something on the white streak. . . . Like blood or something red. . . . [Defendant] was using a paper towel and it was coming back stained red." At some point close to defendant's return, Saadedra noted that he had changed out of a white sweatshirt into a black one, and that he eventually left the house again.

Richard Bowles, who owned or leased 1962 Cabot, recounted that defendant had resided there temporarily in December 2008, and that Bowles met the victim when he arrived at 1962 Cabot with defendant early on December 12, 2008. Bowles remembered that "[e]verything [seemed] cool" with defendant and the victim during their brief visit, and that defendant and the victim left together. Fifteen or 20 minutes later, Bowles heard barking, which drew his attention outside, where he noticed the front gate ajar. Bowles described that he went outside, closed the gate, and "look[ed] up towards Verner [sic], there's nobody. I look to the left and [defendant] comes running out of the alley" "towards the house," alone and without a jacket of Bowles's that defendant had worn when he left with the victim. Defendant told Bowles "[h]e had to leave it and he'll get me another one," and on entering the house explained, "I ran through some mud or something like that and in the dining room he's cleaning his shoes up." Bowles related that "[h]e [defendant] goes upstairs. He comes down. He ends up changing all his clothes. . . . He ends up saying he's got something he's got to take care of, . . . [s]o, he puts on another coat of mine," and "leav[es] on foot again." Bowles recalled as follows defendant's return to 1962 Cabot:

*Bowles*: . . . And a little while elapses . . . and he shows up again.

\* \* \*

He's in the kitchen. . . . He signals me to come to
the kitchen. So, I go in the kitchen and he says, I
fucked dude [the victim] up pretty good. . . .

\* \* \*

Not the name, but he said, dude. Like I fucked dude up pretty good.
But he didn't say the name on it.

*Q*: Okay. You knew who he was referring to?

*Bowles*: Yeah.

*Q*: What did he say he did to [the victim] or dude?

*Bowles*: . . . He didn't exactly say what he did to him though. I'm
looking at him and he's cleaning off the sleeve of the other coat, the
black one, and it kind of gets me mad cause . . .. this is the second
coat tonight. I'm like, what did you do to this one? So, I looked at it
and it's got scrapes on it. Like he used his sleeves to grab something
and it's got some blood on it.  He's trying to get it off, I think.

\* \* \*

*Q*: And what made you think it was blood?

*Bowles*: Because it was like a little drip. Like I didn't know it was
blood.

\* \* \*

. . . [L]ike little spots. Like eye drop spots. . . .

Bowles added that defendant elaborated that he had struck the
victim's head with "a stone or a brick or something like that." Bowles
directed defendant to remove the bloody jacket and shoes from the
house, prompting defendant to leave through the back door "and
jump[] the fence."

In the course of a December 17, 2008 interview with Detroit police
Sergeant Samuel Mackie, defendant authored a handwritten
statement. The writing attributed the initial idea of the victim's attack

- 12 -

to Bowles, who allegedly became angry after the victim had misrepresented whether he possessed any marijuana. According to defendant, Bowles recruited him to participate in the killing:

> . . . [Bowles] told me to walk [the victim] down the alley and he would catch up to us. [Bowles's] trust exercise was if he shot somebody, I would have to shoot that same person, therefore, we would have the same involvement, thus, [we] wouldn't go to the police. While in the alley, I noticed [Bowles] running up behind me. I then hit [the victim] twice with the hammer. [Bowles] asked me,  what are you doing? Then, said finish him, but took the hammer from me and hit him over three times in the face that I remember. I ran off and [Bowles] followed.  He threw the hammer in an industrial dumpster on Ca[bo]t and Longdale. We met back up at his house. I started to wash my shoes. [Bowles] told me don't bother because we have to burn everything. [Bowles] then told me, let's go check everything out. So, we walk out of our reach [sic] just to make it where we would be in the direction of walking up on the body. I notice [the victim] still breathing because blood was bubbling out of his nose. And then [Bowles] found a huge rock and slammed it on [the victim's] face. . . .

> Defendant further explained that he and Bowles had discarded or destroyed in different locations the clothing they had worn in the course of the killing.

The police found the victim lying on his back in an alley, against a brick or concrete wall that bore blood spattering around and several feet above the victim's head; police officers opined at trial that the fatal attack took place as the victim was lying on the ground. A forensic examiner testified that his autopsy of the victim revealed "23 lacerations to the [victim's] head area," representing distinct instances of blunt force trauma to the victim's head. The victim suffered "multiple fractures of the facial bones, the top of the skull, the back of the skull, the inside of the skull, as well as, fragmentation and hemorrhage of both lobes of the brain."

Defendant accompanied the victim on the night before the murder, and was the sole individual witnesses last saw with the victim. The reasonable inferences from these facts, together with defendant's admissions to Bowles and his properly admitted inculpatory statements to Sergeant Mackie, sufficiently proved beyond a reasonable doubt defendant's identity as the victim's killer. And substantial other circumstantial evidence and reasonable inferences established beyond a reasonable doubt that defendant intentionally killed the victim with deliberation and premeditation. Most notably, defendant armed himself with a hammer or other tool immediately before he left with the victim the last time anyone saw the victim; the victim endured a high number of blunt force blows to his head as he was lying on his back; defendant admitted to Bowles that he had used a brick to strike the victim's head, and his statement to Sergeant Mackie that he hit the victim's head with a hammer; and defendant engaged in several instances of conduct after the killing, including his efforts to clean himself and his shoes immediately after returning alone from his recent departure with the victim, and his attempts to discard clothing after the crime. *Ortiz*, 249 Mich App at 301; see also *People v Haywood*, 209 Mich App 217, 229-230; 530 NW2d 497 (1995) (explaining that the defendant's attempt to clean up blood after the killing could be used to infer that he acted with deliberation and premeditation).

In conclusion, sufficient evidence supported the jury's rational determination beyond a reasonable doubt that defendant committed first-degree murder in killing the victim.

*People v. Hurick*, Mich. Court of Appeals decision, ECF No. 12-18, PageID. 848-852. (notes omitted).

A federal court sitting in habeas corpus review of a state criminal trial is to determine whether there was sufficient evidence of the essential elements of the crime to justify *any* rational trier of fact to find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence is to be considered in the light most favorable to the prosecution. *Id.* It is clear that the evidence was sufficient to establish that petitioner committed the crime. The Michigan Court of Appeals decision was not contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or did not result

in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner alleges that the judge was not impartial during his trial. Petitioner argues that the judge limited Petitioner's ability to present a defense by making a number of unfair rulings that were adverse to Petitioner. Petitioner contends that the judge mistakenly ruled that Petitioner was competent to stand trial and competent to waive his *Miranda* rights. Petitioner asserts that the judge showed bias by refusing to adjourn the trial to obtain an independent forensic examination. Petitioner states that since the judge improperly refused his request for adjournment on three occasions, he was forced to present a defense at trial without proper pretrial preparation. Petitioner argues that this shows clear bias on behalf of the trial judge.

Petitioner first raised this claim in his motion for relief from judgment. The court denied the motion because Petitioner failed to show "good cause" and "actual prejudice" to justify a motion for relief from judgment and because Petitioner was not denied his constitutional rights to a fair trial due to judicial bias. *People v. Hurick*, No 09-523-01-FC, Opinion and Order, ECF No. 12-20.

Petitioner's motion for relief from judgment was denied because he failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)(3). However, a claim of judicial bias alleges a structural error that a criminal defendant may not forfeit. *Railey v. Webb*, 540 F.3d 393, 398 (6th Cir. 2008) Nor may the claim be subject to a harmless error analysis. *Id*.

> [D]ue process demands that the judge be unbiased. *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of *actual* bias in the trial of cases." (emphasis added)). Furthermore, a judge can and should be disqualified for "bias, [ ] a likelihood of bias[,] or [even] an appearance of bias." *See Ungar v. Sarafite*, 376 U.S. 575, 588, 84 S.

- 15 -

Ct. 841, 11 L. Ed. 2d 921 (1964); *see also Murchison*, 349 U.S. at 136 ("[O]ur system of law has always endeavored to prevent even the probability of unfairness."); *accord Anderson v. Sheppard*, 856 F.2d 741, 746 (6th Cir.1988) (opining that due process "require[s] not only an absence of actual bias, but an absence of even the appearance of judicial bias").

But, it is also clear that judicial disqualification based on a likelihood or an appearance of bias is not always of constitutional significance; indeed, "most matters relating to judicial disqualification d[o] not rise to a constitutional level." *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702, 68 S. Ct. 793, 92 L. Ed. 1010 (1948) (citing *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S. Ct. 437, 71 L. Ed. 749 (1927) ("All questions of judicial qualification may not involve constitutional validity."); *see also Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 (1997) ("Of course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause ... establishes a constitutional floor, not a uniform standard. Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar."). In only two types of cases has the Supreme Court actually held that something less than actual bias violates constitutional due process – (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. 523 (subsequently expanded to include even indirect pecuniary interest); and (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack from the contemnor).

The Court has also acknowledged four types of cases that, although they present prudent grounds for disqualification as a matter of common sense, ethics, or "legislative discretion," generally do not rise to a constitutional level-"matters of [1] kinship, [2] personal bias, [3] state policy, [and][4] remoteness of interest." *Tumey*, 273 U.S. 523; *accord Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820, 106 S. Ct. 1580, 89 L. Ed. 2d 823 (1986). But, in the 81 years since *Tumey*, the Court has yet to expound upon this general statement regarding the presumptive constitutional indifference to these types of issues.

*Id. at* 399-400 (6th Cir. 2008) (notes omitted).

The Supreme Court has confirmed that judicial rulings and opinions formed by a judge based upon the facts of the proceedings are generally not enough to show judicial bias. *Liteky v. United States*, 510 U.S. 540, 555-556 (1994):

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. See *United States v. Grinnell Corp.,* 384 U.S., at 583, 86 S.Ct., at 1710. In and of themselves (*i.e.,* apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German–American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.,* at 28 (internal quotation marks omitted). *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* In the opinion of the undersigned, Petitioner has not established judicial bias simply by showing that the judge made rulings that were unfavorable to Petitioner, including the denial of Petitioner's requests for adjournment.

Petitioner argues that his confrontation rights were violated when the judge admitted the preliminary examination testimony of Richard Bowles after Bowles refused to testify at the trial. At trial, witness Bowles refused to continue answering questions. The court ruled that witness Bowles' preliminary examination testimony could be read to the jury. Petitioner first presented this issue in his motion for relief from judgment. The court denied this motion stating:

> Defendant argues that his Sixth Amendment right to confront his accuser was violated when witness Richard Bowles' preliminary examination testimony was read at trial. Defendant contends that his defense counsel Lillian Diallo did not adequately cross-examine the witness at the preliminary examination and the use of the preliminary examination testimony of Richard Bowles at trial violated his right to confront the witness. The Confrontation Clause to the United States Constitution guarantees only that a defendant has the opportunity for effective cross-examination; a defendant is not guaranteed an ideal cross examination, *United States v. Owens*, 484 US 554, 559: 108 S Ct 838 (1988). Defense counsel was given an opportunity to cross examine the witness at the preliminary examination; the adequacy of the cross-examination does not present an issue to this Court. Therefore, Defendant's argument must fail.

*People v. Hurick*, No 09-523-01-FC, Opinion and Order, ECF No. 12-20, PageID. 1198.

Testimonial out-of-court statements by witnesses are barred under the Confrontation Clause unless witnesses are unavailable and defendants had a prior opportunity to cross-examine witnesses, regardless of whether such statements are deemed reliable by court. *Crawford v. Washington*, 541 U.S. 36 (2004) (abrogating *Ohio v. Roberts*, 448 U.S. 56 (1980)). In *California v. Green*, 399 U.S. 149, 157-58 (1970), the Court compared the purposes of confrontation with the dangers in admitting an out-of-court statement. Confrontation "(1) insures that the witness will give his statements under oath--thus impressing the witness with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for discovery of truth'; and (3) permits

the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *Green*, 399 U.S. at 158. Although an out-of-court statement may not have been subject to any of these protections, it regains the lost protections if the declarant is present and testifying at trial. *Id.* at 158. Where the declarant testifies and is cross-examined, "our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem." *Green*, 399 U.S. at 162.

In this case, witness Bowles refused to testify at Petitioner's trial and was considered unavailable. The reading of witness Bowles' testimony from the preliminary examination, where Petitioner's counsel actually cross-examined Bowles, did not violate the Confrontation Clause. In the opinion of the undersigned, the Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Petitioner argues that his Fourth Amendment rights were violated because no probable cause determination was made before the issuance of the complaint and arrest warrant. Petitioner's claim was rejected when first brought in his motion for relief from judgment. In the opinion of the undersigned, Petitioner's claim is subject to dismissal under the rule announced in *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone*, the Supreme Court concluded that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 482.

In *Riley v. Gray*, 674 F.2d 522 (6th Cir.), *cert. denied*, 459 U.S. 948 (1982), the Sixth Circuit interpreted *Stone* as requiring the district court to make two distinct inquiries in habeas proceedings:

> Initially, the district court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980). Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism. *See Boyd v. Mintz*, 631 F.2d 247, 250 (3rd Cir. 1980); *Gates v. Henderson*, 568 F.2d 830, 840 (2nd Cir. 1977) (*en banc*), *cert. denied*, 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978).

*Id.* at 526 (footnote omitted). The record reveals no reason why Petitioner would have been prevented from raising his Fourth Amendment claims in the state courts. Indeed, Petitioner did have the opportunity to raise these issues in the state courts, where they were rejected. Accordingly, in the opinion of the undersigned, Petitioner is precluded from raising this claim under the rule announced in *Stone v. Powell*.

Petitioner argues that his statements should have been suppressed because they violated his Fifth Amendment rights. Petitioner asserts that his statements were made under duress and coercion, and that he was not competent to waive his *Miranda* rights. Petitioner first presented this issue in his motion for relief from judgment where it was rejected by the trial court under MCR 6.503(D)(3)(b):

> Defendant argues that he did not have the sufficient mental capacity to make a knowing waiver of his *Miranda* rights due to his mental health issues. Defendant avers that at the time of his *Miranda* waiver, he was suffering from paranoid schizophrenia, depression, attention deficit hyperactivity disorder (ADHD) and brain damage. As such, Defendant contends that he is entitled to have his statement suppressed. This Court disagrees. A defendant's mental incompetency alone does not render a defendant's confession involuntary, evidence of police misconduct or coercion must exist, *Colorado v Connelly*

- 20 -

> 479 US 157, 164; 107 S Ct 515 (1986). Although Defendant alleges that there was some level of police coercion that led to his involuntary confession, this Court declines to address this issue as this issue has been fully examined by the Michigan Court of Appeals and the Court found no record giving rise to any police coercion concerning Defendant's statement. Similarly, this Court also declines to address Defendant's unpreserved issue regarding entitlement to a *Walker* hearing to determine voluntariness of his confession. Defendant's trial counsel never specifically requested the trial court to hold a *Walker* hearing, consequently, this Court will not address this issue.  As such, Defendant's argument that the waiver of his *Miranda* rights was not voluntary must fail.

*People v. Hurick*, No 09-523-01-FC, Opinion and Order, ECF No. 12-20, PageID. 1200.  As noted by the Circuit Court, the Michigan Court of Appeals rejected Petitioner's claim that he lacked the mental capacity to waive his *Miranda* rights.  The Michigan Court of Appeals specifically found that the  evidence showed that Petitioner had the capacity to waive his *Miranda* rights and that "the record otherwise remains entirely devoid of any medical records, testimony, affidavits or any offer of proof tending to substantiate that defendant suffered from a mental illness or infirmity that may have diminished or precluded his culpability for killing the victim."  *People v. Hurick*, Mich. Court of Appeals decision, ECF No. 12-18, PageID. 846.  Further, the Michigan Court of Appeals rejected Petitioner's claim that his statements to police were made involuntarily.

> The defense at no point raised a challenge to the admissibility of the statements defendant made to the police. Although a trial court must sua sponte investigate the voluntary nature of a defendant's statement if "the evidence clearly and substantially reflects a question about the voluntary nature of a confession or implicates other due process concerns," the record reveals no such circumstances in this case. *People v Ray*, 431 Mich 260, 271; 430 NW2d 626 (1988). The parties do not dispute that the only forensic psychiatric evaluation in the record concluded that defendant had the capacity to waive his *Miranda* rights at the time he made his statements, and defendant presented no evidence tending to substantiate that he labored under any mental or emotional infirmity that might have placed in doubt the voluntary, knowing and intelligent nature of his statement. Furthermore, the available record gives rise to no suggestion of police

coercion. The police arrested defendant on December 15, 2008, and a [now] deceased police officer attempted to interview defendant on December 16, 2008. The sergeant who testified at trial recounted that he briefly and unsuccessfully interviewed defendant at some point on December 17, 2008, and that he later returned to discuss the victim's murder with defendant at defendant's request. The December 17, 2008 interviews encompassed approximately 90 minutes, and the sergeant denied noticing any signs that defendant had offered his statements unwillingly.

*People v. Hurick*, Mich. Court of Appeals decision, ECF No. 12-18, Page Id. 847.

In *Connelly*, the court rejected the argument that a defendant's mental state without police coercion was enough to suppress a confession as involuntary. In that case, the defendant suffered from chronic schizophrenia. The voice of God told defendant to confess to the murder. Defendant contacted police and confessed to the murder. The Supreme Court rejected the contention that defendant's mental state alone rendered the confession involuntary. "But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Id*. at 164.

In *Daoud v. Davis*, 618 F.3d 525 (6th Cir. 2010), the court explained:

Daoud contends that he did not knowingly and intelligently waive his Miranda rights when he confessed to his mother's murder and that admitting those statements at trial violated his Fifth Amendment rights. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court established "certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 201, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989). However, a suspect may waive his Miranda rights "provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. This inquiry "has two distinct dimensions." *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

> *Moran*, 475 U.S. at 421, 106 S.Ct. 1135 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

> To be deemed knowing and intelligent, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Spring*, 479 U.S. at 574, 107 S.Ct. 851. Instead, "we examine 'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused,'" *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir.2009) (alterations in original) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)), to determine "whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time,'" *id*. (alterations in original) (quoting *Spring*, 479 U.S. at 574, 107 S.Ct. 851).

*Id.* at 528-530. *See also Garner v. Mitchell*, 557 F.3d 257 (6th Cir. 2009).

Petitioner has presented no evidence that would tend to show that he did not have the capacity to waive his *Miranda* rights or that his statement was the product of police coercion. In the opinion of the undersigned, the Michigan Court of Appeals' decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

- 23 -

Petitioner argues that his trial counsel was ineffective in failing to put forth a meaningful defense and in making poor strategic choices. Petitioner asserts that three different attorneys were ineffective prior to trial and during trial. Petitioner first raised this claim in his motion for relief from judgment. Petitioner argues that it was error not to have him evaluated independently for competency to stand trial and to waive his *Miranda* rights. Petitioner argues that the voluntariness of his statement to police should have been challenged, and Petitioner further states that witness Bullock should have been more effectively cross-examined by counsel, and that his testimony should have been more effectively challenged during the admission of the preliminary examination transcript at trial. In addressing this issue, the Michigan Circuit Court stated:

> Defendant argues that his representation by Lillian Diallo, Larry Polk and Steven Bullock was inefficient and denied him a fair trial. In his motion, Defendant makes reference to several instances where trial counsel failed to object to the admission of certain evidence, failure of counsel to properly cross-examine witnesses and failure of counsel to put the prosecution's case to meaningful adversarial testing (Defendant's motion). Effective assistance of counsel if presumed, and a defendant bears a heavy burden of proving otherwise, *People v McGhee,* 268 Mich App 600,625; 709 NW2d 595 (2005). Defendant's allegations supporting his claim of ineffective assistance of counsel focus on the trial strategy of his attorneys. Without proof of substantial prejudice, a defense attorney's choice to pursue one of two weak defense strategies is not ineffective assistance, *People v LaVearn,* 448 Mich 207, 216; 528 NW2d 721 (1995). In order to prevail under a claim of ineffective assistance of counsel, defendant must show that counsel's performance was deficient and that he was prejudiced by the deficient performance, *Strickland v Washington,* 466 US 668; 104 S Ct 2052 (1984). This Court does not find that the trial strategies utilized by defense counsel prejudiced Defendant. Whether or not to call a witness, cross-examine or object to evidence are all tactical matters of trial strategy and do not rise to the level of ineffective assistance of counsel absent a showing of substantial prejudice to the defendant. This Court finds no such prejudice. As such, Defendant is not entitled to a *Ginther* hearing and his argument must fail.

*People v. Hurick*, No 09-523-01-FC, Opinion and Order, ECF No. 12-20, PageID. 1201.

The court found that Petitioner could not overcome his failure to present this issue on appeal by showing good cause or prejudice and denied Petitioner relief under MCR 6.508 (D)(3)(b). Under MCR 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C. R. 6.508(D)(3)(a)-(b). In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence. *Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000). Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MC R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action. *See Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998). In the opinion of the undersigned, Petitioner procedurally defaulted his claims of ineffective assistance of trial counsel. Moreover, Petitioner cannot overcome his procedural default, by showing cause and prejudice.

In *Strickland*, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance

must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

In the opinion of the undersigned, Petitioner has not shown that his counsel constitutionally erred by not seeking independent mental examinations. Nothing in the record supports a need for an independent mental examination, nor can Petitioner establish that an independent examiner would have come to a different conclusion from that of the center for forensic psychiatry. Further, Petitioner has not shown that his attorneys constitutionally erred in cross-examination or in the strategic choices that were made in his defense. In the opinion of the undersigned, Petitioner cannot show that he received ineffective assistance of counsel. Most importantly, Petitioner cannot establish that the state court findings on these issues were unreasonable.

Petitioner asserts that his appellate counsel was ineffective for failing to raise each issue asserted in this petition. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745,

751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.* In the opinion of the undersigned, Petitioner has not shown that his appellate counsel was ineffective. Petitioner has simply not shown that he could have obtained relief if his appellate counsel included any additional claim in his appeal of right.

Accordingly, it is recommended that the petition be dismissed and that Petitioner's motion for summary judgment (ECF No. 18) be denied.

In addition, if Petitioner should choose to appeal this action, I recommend that a certificate of appealability be denied as to each issue raised by the Petitioner in this application for habeas corpus relief. Under 28 U.S.C. § 2253(c)(2), the court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the undersigned has examined each of Petitioner's claims under the *Slack* standard.

- 27 -

Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  The undersigned concludes that reasonable jurists could not find that a dismissal of each of Petitioner's claims was debatable or wrong.  Therefore, the undersigned recommends that the court deny Petitioner a certificate of appealability.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

 /s/ TIMOTHY P. GREELEY
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: January 21, 2016